**HERRNSTEIN v. UNITED STATES.**
No. K–82.

Court of Claims.
April 26, 1937.

Raymond A. Lash, of Washington, D. C. (Francis R. Lash, of Washington, D. C., on the brief), for plaintiff.

J. H. Sheppard, of Washington, D. C., and Robert H. Jackson, Asst. Atty. Gen., for defendant.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

LITTLETON, Judge.

Plaintiff insists that the Standard Cereal Company, for which he is trustee, was entitled in the computation of its net income for 1918 to a deduction of $25,000 for obsolescence of its tangible assets used in its business and that in the computation of its net income for 1919 to a deduction of $89,758.49 for the loss of the intangible value of its business, and to a deduction of its claimed net loss of $71,527.61 for 1919 from its net income for 1918. It is further insisted, in the alternative, that if the corporation was not entitled in the computation of its net income for 1919 to a deduction for the loss of the intangible value of its business, it was entitled in the computation of its net income for 1918 to a deduction of $89,758.49 for the loss of such intangible value. It is further claimed that the additional tax of $186.78 for 1916 was assessed and collected after the expiration of the period of limitation provided by law.

On the record in this case we are of opinion that the Standard Cereal Company did not sustain any loss on its tangible assets in 1918 or in any other year. It did not cease operations in 1918 because of the advent of prohibition, nor did it abandon its plant in whole or in part. It continued operations until February 1, 1920, and sold its plant March 15 of that year at a profit. The sales price of the plant was $90,000.

On December 2, 1919, the Board of Directors adopted a resolution, subject to

the approval of the stockholders, directing the discontinuance of operations by February 1, 1920, and the subsequent sale of the plant. Pursuant to this action the plant was advertised for sale in milling and trade journals and on March 15, 1920, it was purchased by the Snyder Milling Company. At that time the book cost of the tangible assets was $111,125, which cost did not take into consideration any depreciation from date of acquisition to March 1, 1913, on assets purchased prior to that date. From March 1, 1913, to date of sale the Standard Cereal Company had claimed and been allowed accrued depreciation of $44,725 on its tangible assets, leaving an unextinguished cost on March 15, 1920, of $66,400. The sale of the plant for $90,000, therefore, resulted in a profit of $23,600, which was reported as income by the company in its return for 1920. Subsequently, however, the Commissioner adjusted the cost basis of the assets sold to $134,680.67 and accrued depreciation to $49,064.68. As a result, he determined a profit on the sale of only $4,384.01. These facts show that instead of sustaining any obsolescence or loss on its tangible assets, the company actually realized a profit.

An additional reason for the denial of plaintiff's claimed deduction of $25,000 in 1918 for obsolescence of tangible assets, due to progress of national prohibition legislation, is that the year 1918 was one of the most profitable periods in the entire existence of the company. During that year its sales of brewers' grits, upon which it bases its claim for obsolescence, were only $3,867, the smallest item in its entire income. Its sales during 1918 of other products were as follows:

| | |
|---|---|
| Corn-flour substitute | $334,000 |
| Hominy | 264,000 |
| Hominy feed | 223,700 |
| Corn meal | 49,000 |
| Shelled corn | 10,000 |

In the production of these commodities the company utilized the same machinery and equipment on which the trustee is now claiming obsolescence. It is alleged that special machinery was required for the manufacture of brewers' grits, and that the progress of national prohibition demonstrated to the Board of Directors in 1918 that this machinery would rapidly become obsolete. It will be noted, however, that in 1918 the sales of brewers' grits constituted only a very small part of the business of the company. Its largest sales consisted of corn-flour substitute, hominy, and hominy feed. It is clear that prohibition legislation imposed no bar upon the production or sale of these commodities and that it required only a simple adjustment of the burrs on the reducing machinery for the manufacture of brewers' grits to manufacture corn flour, hominy feed, or corn meal. No special machinery was required for the manufacture of the products mentioned above other than brewers' grits. The record shows, therefore, that the advent of prohibition was not the cause of any loss to the company of its customers for brewers' grits. It discontinued that phase of its business voluntarily and for the purpose of increasing its profits through sale of the other products. If, therefore, the company sustained any loss of tangible property, such loss occurred in the years prior to 1918, when it discontinued the manufacture of brewers' grits.

In July, 1919, the Board of Directors of the Standard Cereal Company authorized it to join the American Maize Exporters' Association with a view to recouping that phase of its business which contemplated the manufacture and sale of brewers' grits to foreign brewers, and, thereafter, the company, to some extent, engaged in exporting this product until the latter part of 1919. The facts do not show the volume of business from this source. In the manufacture of products other than brewers' grits, the corporation used the identical machinery on which a loss is here claimed. Moreover, in October, 1918, the company made an appraisal of its plant and the appraisers and engineers employed for that purpose furnished the company a certificate to the effect that the plant had a cash value on that date of $259,169.85; this amount was clearly in excess of the then unextinguished cost basis of $66,400.

National prohibition legislation did not, as shown by the facts in this case, directly affect the Standard Cereal Company. It was free to operate to full capacity after the enactment of the National Prohibition Act (41 Stat. 305) as it was before, and its machinery and equipment were just as capable then, as before, of producing the products which it was then manufacturing. The fact that it had practically abandoned the manufacture of brewers' grits in order to manufacture

products which would yield a greater return cannot be made the ground for a deduction for obsolescence in a later year. We think it is clear that no loss for obsolescence was sustained by the company on its tangible assets during 1918 or any other year.

The next claim of the plaintiff is that the corporation was entitled to a deduction of $89,758.49 for 1919 for obsolescence or loss of good will due to national prohibition legislation. In support of this claimed deduction, it is contended that the Snyder Milling Company, the purchaser of all the assets of the Standard Cereal Company, did not purchase the "business," but only the buildings, machinery, and equipment. The record shows that the Snyder Milling Company purchased the entire plant and business of the plaintiff, including good will. The contract of sale provided that "Said party of the first part agrees not to enter into the grain or milling business in Chillicothe, Ohio, for a period of ten years after delivery of said deed." This provision clearly indicates that the Snyder Milling Company was purchasing a going business and was protecting its competitive interests by providing that the vendor should not enter that field of endeavor until the purchaser had established its own business. See Clarke v. Haberle Crystal Springs Brewing Co., 280 U. S. 384, 50 S.Ct. 155, 74 L.Ed. 498; Renziehausen v. Lucas, 280 U.S. 387, 50 S. Ct. 156, 74 L.Ed. 501; Rockwood, Trustee, v. United States, 38 F.(2d) 707, 69 Ct.Cl. 285, 292.

The contention of plaintiff that if the corporation was not entitled to take a deduction for obsolescence of its intangible assets it was entitled to claim such a deduction as a loss is denied on the authority of the opinion of this court in Seneca Hotel v. United States, 42 F.(2d) 343, 70 Ct.Cl. 316, 319.

The last point relates to an additional tax of $186.78 for 1916, which plaintiff contends was barred at the time of collection. On September 1, 1923, the taxpayer, the Standard Cereal Company, executed and filed with the Commissioner a waiver of the statute of limitation consenting to extension of the statutory period of limitation for assessment and collection of any tax for 1916 for one year from the date the waiver was sign-

ed by the taxpayer. Therefore, on September 27, 1923, the taxpayer filed a claim for credit and refund requesting that the additional tax of $186.78 determined for 1916, be satisfied by credit of a claimed overpayment for 1918. No overpayment for 1918 was determined and the additional tax for 1916, of which the plaintiff had been advised, was assessed by the Commissioner in November, 1923, and was paid March 15, 1924. There is no evidence in the record to show that the waiver of September 1, 1923, was in anywise invalid. The waiver clearly gave the Commissioner authority to assess and collect the tax at any time within one year after the date on which the waiver was executed. This was done. The fact that the limitation period of five yea, from the date the return for 1916 was filed had expired when the waiver was executed did not affect its validity. Plaintiff is not entitled to recover and the petition is dismissed. It is so ordered.